**UNITED STATES, Plaintiff,**

v.

**SPEED JOYEROS, S.A,; Argento Vivo, S.A.; Yardena Hebroni a/k/a Yardena Hevroni; and Eliahu Mizrahi, Defendants.**

**No. 00 CR 960(JBW).**

United States District Court, E.D. New York.

May 9, 2002.

John Roth, Chief, Narcotics & Dangerous Drug Section, United States Department of Justice, Washington, DC, By Laurel Loomis, Esq., Eric Snyder, Esq., Armando Bonilla, Esq., Alan Vinegrad, United States Attorney, Eastern District of New York, By David Goldberg, Esq., Claire Kedeshian, Esq., for United States.

Larry Silverman, Esq., New York, for Defendants Hebroni and Speed Joyeros, S.A.

Roger Adler, New York, for defendant Hebroni, appointed by the court pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A.

Vivian Shevitz, South Salem, NY, for defendant Argento Vivo, S.A.

### MEMORANDUM, ORDER, AND JUDGMENT

WEINSTEIN, Senior District Court J.

Table of Contents:

I. Introduction .................................................. 417
II. Facts ......................................................... 418
 A. Background ............................................... 418
 B. Procedural History ....................................... 419
III. Law .......................................................... 422
 A. Conflicts of Interest ..................................... 422
 B. Plea Bargains ............................................ 422
 1. Plea Bargaining and Coercion ......................... 422
 2. Competency to Plead .................................. 426
 3. Changes in the Criminal Justice System ............... 427
 C. Bail ..................................................... 434

 1. Law Governing Bail ............................................434
 2. History of Bail Reform .......................................434
 3. Constitutional Requirements .................................437
 4. Use of Pretrial Services.....................................438
 D. Speedy Trial ..................................................438
 1. Constitutional Aspects ......................................438
 2. Statutes and Rules ..........................................439
 E. Sentencing.....................................................439
 1. Departure.....................................................439
 a. Destruction of Livelihood ................................440
 b. Stress of Pretrial Incarceration .........................441
 2. Fine..........................................................442
 3. Credit for Good Behavior ...................................443
 4. Supervised Release...........................................443
IV. Application of Law to Facts ....................................444
 A. Defendant's Ability to Plead .................................444
 B. Conflicts of Interest.........................................444
 C. Sentencing....................................................445
 1. Calculation of offense level ...............................445
 2. Departure.....................................................445
 3. Credit for time served and for good behavior ..............446
 4. Supervised Release...........................................446
 V. Conclusion .....................................................446
Appendix 1: Types of Sentencing Departure by Year..................446
Appendix 2: Disposition of Federal Criminal Defendants, National...448
Appendix 3: Disposition of Federal Criminal Defendants, Eastern District of New York .............................................................450

## I. Introduction

The questions posed are whether acceptance of a plea of guilty and a departure downward in sentencing were appropriate in this substantial money laundering case. Serious factual and legal issues are presented by evidence of the defendant's long pretrial incarceration under onerous conditions, the government's control over funding for her counsel and the threat of much greater punishment without a plea.

This case illustrates the danger of due process violations by intensive pressure on defendants to plead guilty because of lengthy pretrial incarcerations and the offer of advantageous deals for lesser terms of imprisonment. The stick and carrot—largely controlled by prosecutors—produces a danger of excessive coercion of a defendant and undue pressures on defense counsel to avoid trial. It requires particularly close supervision by the court to ensure voluntariness of the plea. In evaluating the need for sentencing departures the

unusual tensions some defendants face while in custody awaiting trial also necessitate consideration.

The virtual elimination of federal criminal trials, substituting administrative decisions not to prosecute or pleas of guilty, has substantially changed our federal criminal law system. Increased prosecutorial discretion and power have raised the percent of guilty pleas from 86% of all federal convictions in 1971 to 95% in 2001. Discretion not to prosecute is widely exercised. Enhancement of control of sentencing by the prosecutor as a result of sentencing guidelines and minimum sentences has increased the government's power to coerce defendants. There has been a change from the paradigmatic concept of investigation and accusation by the government of almost all persons believed to have committed crimes, trial by jury with a strong role for defense counsel, and discretion in sentencing by the court, to a system sharply reducing the role of de-

fense counsel, the jury and the judge, and whatever protections they can afford a defendant.

Defendant Hebroni and codefendants were charged with using jewelry businesses in Panama to launder some $10,000,000 of drug money. The prosecution was controlled by the Narcotics and Dangerous Drugs section of the United States Department of Justice, from Washington, D.C., rather than by the district's United States Attorney.

After lengthy pre-trial proceedings, drawn out over a period of more than a year and a half largely because of failure of the government to produce the huge amount of documents seized by the government of Panama; successive grants of bail by the trial court which were overturned on appeal; and strong government opposition to payment of defense counsel from defendant's known assets, all of which had been seized; defendant and the government entered into a plea agreement. It required defendant to be incarcerated for a term of somewhere between 33 and 41 months under the guidelines, and to give up all her assets. Without such an agreement, upon conviction she would have faced a prison sentence of 151 to 188 months and possibly more, based on a level of 34 or higher. See U.S. Sentencing Guidelines Manual §§ 2S1.1(b)(1) & 2S1.1(b)(2)(I) (2001) (hereinafter "Guidelines Manual").

The court entertained doubts about 1) defendant's capacity and desire to sign the plea agreement and 2) a possible conflict of interest of defense counsel in recommending a plea. Accordingly, the defendant was ordered to undergo a psychiatric evaluation to determine her fitness. Additional defense counsel was appointed to ensure that defendant's rights were fully protected and that she was being appropriately advised.

Ultimately defendant's plea was accepted by the court. While defendant agreed not to seek a downward departure, the agreement did not limit the court's independent authority to consider such a departure. On the basis of the presentence report, briefs by both sides and sentencing hearings, the court departed downward 2 levels and sentenced the defendant to a total of 27 months in prison and forfeiture of all her personal and business assets, a fine, and a term of supervised release of three years, during which time defendant may not engage in the jewelry or rare metals business, nor conduct any business in Panama.

## II. Facts

### A. Background

Defendant Hebroni is a citizen of Israel domiciled in Panama. She is forty-nine years old and recently widowed. Her immediate family is her 6–year–old son, now a resident of Israel, who was conceived after many years of medical intervention. Defendant appears to be an intelligent woman, though physically frail.

The court was presented with no admissible evidence. From the contentions of government counsel and concessions by defendant, the facts can be briefly summarized as follows:

Co-defendant Speed Joyeros, S.A., is a jewelry business fully owned by defendant Hebroni. Speed Joyeros, S.A., engaged in the sale of gold and silver jewelry and precious metals to many retail and wholesale customers throughout Central and South America and in Europe and the Middle East. Defendant's business was among the most successful jewelry businesses in the Colon, Panama Free Zone, with revenues of $155 million in 1998 and $105 million in 1999.

She received cash, checks and electronic money transfers in a money laundering scheme. A primary modus was to sell jewelry to drug lords, knowing that it was being paid for with drug money, thus allowing them to convert dirty money into glistening clean jewelry. Financial institutions in the United States and other countries were employed in these conversions.

Co-defendant Argento Vivo S.A. is a corporation controlled by defendant's brother and a named co-defendant, Eliahu Mizrahi, who has not been found. Argento Vivo, S.A. is a wholesale and retail jewelry dealer engaged in the sale of silver jewelry to retail stores located throughout Central and South America.

### B. Procedural History

On September 22, 2000, Hebroni was arrested and detained on money laundering charges. She had voluntarily come to this country from Panama to defend against forfeiture proceedings commenced here against millions of dollars of her assets, mainly in Panama. Some $ 900,000 were in American banks. The indictment charged the defendant with five counts of washing and conspiring to wash drug money. 18 U.S.C. §§ 1956, 1957. A superceding indictment was filed more than a year later, on December 13, 2001, clarifying the government's legal theory.

On October 10, 2000, defendant pled not guilty. After various pretrial motions, defendant sought bail. On July 2, 2001, bail was denied by the judge previously assigned to the case.

The case lagged, with large numbers of the basic business records from Panama unavailable in this country. All the documents used by defendants in their Panamanian businesses had been seized by the government of Panama. Despite repeated attempts by the defendant to retrieve and examine these many thousands of papers in preparation for trial, they had still not been fully examined by the defense up to the time of plea.

After new bail hearings, on December 12, 2001, defendant was ordered released if she could satisfy specified conditions. The magistrate judge's hearings determined that pledged property fit the conditions set by the court. It was the court's view that the bail and other conditions would ensure that defendant could prepare for trial and that she would be present at trial. These reasons were stated orally on the record. Transcript of Dec. 12, 2001, pp. 39–56. The court was particularly concerned that without bailed release there was a serious possibility that defendant would not be able to properly defend herself. Her defense as well as the prosecution was to be based on the documents seized from her place of business by Panamanian authorities. They had not yet been provided to her. In addition, her incarceration limited her ability to work with her attorneys, accountants, and the necessary calculators and computers required to analyze the extensive business records in this complex case. Trial was set for March 11, 2002, giving defendant just under three months to prepare.

The government appealed from the order of December 12, 2001 granting release on conditions. Release was stayed by the court of appeals. By its decision of January 8, 2002, it vacated the district court's order. The district court was directed to consider "the determinative question specified by § 3142—whether any combination of conditions would reasonably assure Hebroni's appearance as required." *See United States v. Hebroni,* 25 Fed.Appx. 85, 86 (2d Cir.2002). Following remand, the district court held two additional evidentiary hearings.

Important events bearing on defendant's ability to defend had occurred. First, over strong government objection, the court or-

dered the release of sufficient of the defendants' funds to pay her attorneys for work done to that time.

Second, the government began to make available to defendant numerous boxes of papers. Since she was unable to study these documents except while she was detained, the court made available a room in the courthouse. She was brought to and from prison each day to view her business writings under the guard of the marshals. This procedure was burdensome since defendant was given limited space and she did not have the necessary equipment and assistance. Trial would have required introduction and analysis of thousands of documents, tracing transactions running through institutions in many countries.

Third, defendant suffered physically. She submitted evidence indicating that she was being held in the open in cold weather for lengthy periods each day with inadequate clothing awaiting transportation between jail and court, and was not being provided with appropriate food. The court observed her physical and emotional deterioration. On February 1, 2002, the court ordered that she be provided with adequate clothing. On February 11, 2002, the court ordered that she be provided with appropriate food. Despite these measures, continued suffering of the defendant was noted.

Conditions of incarceration of the defendant and the nature of the case raised doubts that due process could be served without some form of release. The defendant had to be able to prepare for her impending trial. In the court's view the bail terms were sufficient to assure her presence at trial. The district court again granted bail on February 12, 2002 with detailed findings as required by the court of appeals. *See United States v. Hebroni,* 187 F.Supp.2d 75 (E.D.N.Y.2002). The conditions were stringent. Defendant was to be detained under house arrest; monitored by Pretrial Services with an electronic bracelet at her own cost; subject to telephone monitoring; subject to a curfew; guarded at all times if the government wished; required to place her passport in government custody; and required to post bail of $10,000,000 guaranteed by substantial real property.

At the time bail was granted this second time, the court noted that defendant was only a month away from trial, so that further detention would seriously hinder her ability to present a defense. Delays in release on bail worked in the government's favor since it shortened the time when defendant and her counsel could analyze the evidence in an appropriate environment.

The government appealed from the district court's February 12, 2002 order granting release on bail. The court of appeals stayed the order. Ultimately the court of appeals, on March 13, 2002, reversed the district court's order "for the reasons stated in the government's brief." *See United States v. Hebroni,* 2002 WL 391179 (2d Cir. Slip Op. Mar. 13, 2002).

As the defense's difficulty in adequately preparing for trial under these conditions became more evident, and the date of trial grew closer, the parties notified the court that they wished to enter into a plea agreement. Defendant agreed to plead guilty to count one of the indictment. See 18 U.S.C. § 1956(h). Count one contains allegations of millions of dollars in money laundering, but the parties agreed that the guilty plea would be limited to $474,000 of specific money laundering events. Defendant agreed "not to contest that the Government would have proven beyond a reasonable doubt at trial in this case that the funds identified in Count One of the indictment were derived from drug trafficking." Plea paragraph 5(b).

The agreement incorporated contemplated terms of a sentence for the defendant. As already noted, the prospective guideline was at level 20, carrying a range of imprisonment of 33 to 41 months; it included a downward adjustment for acceptance of responsibility. Defendant agreed not to seek a downward departure or to appeal her sentence if it was not greater than 41 months. She also agreed to forfeit all of her own ownership of assets in the defendant companies (estimated at some $6,000,000) which had been seized by Panamanian authorities, as well as the remaining more than $600,0000 of assets in a United States bank. The indicted corporations also pleaded guilty as part of the deal.

A hearing was held on March 1, 2002 to review the plea. For reasons set out orally at that time, and suggested in further detail in this memorandum, the court ordered that the defendant be examined by a physician to assist in determining if her plea was voluntary. The resulting report of Dr. Sanford L. Drob was illuminating.

Dr. Drob noted that Ms. Hebroni had suffered physically during her incarceration, especially in recent months when she was shuttled back and forth from jail to court daily to review papers. He also pointed out that Ms. Hebroni was exceedingly anxious to be reunited with her infant son. She told Dr. Drob that the reason she had agreed to a plea was to be reunited with her son sooner. She was, according to the Doctor, under the erroneous impression that she would be sentenced to time served. She stated, according to his report, that she believed that "you can't win" at trial. Dr. Drob concluded that defendant would have been far less likely to accept a plea agreement if she had been allowed to leave jail on bail while awaiting trial.

Dr. Drob noted that "several factors" were involved in defendant's decision to plead. The primary reason was concern for her son. She had suffered unusual stress as a result of separation from him— her only child and the result of years of fertility treatments. Since she was widowed, her son depended on her as his only parent; she had already had to explain an absence of 18 months. She also felt physically worn down and ill-equipped to undergo a lengthy trial.

Since the report indicated that defendant had an erroneous understanding of the plea agreement—which did not, as she reportedly thought, require immediate release—the court ordered defense counsel to make clear to their client the effect of the agreement. The court appointed supplemental counsel to ensure that defendant's rights were adequately protected. It was concerned that the lack of defendant's assets to pay legal and other costs of a trial might have produced an inclination of defense counsel to reduce their own obligations and potential financial risk were there a full trial, by recommending a plea.

On March 20, 2002, the court held a second hearing on the plea agreement. All parties, including supplemental counsel, were present. Defense counsel stated that defendant was aware of the effect of the plea agreement and was capable of making the agreement. Based on this affirmation; the medical report; an oral report of supplemental defense counsel that defendant understood the plea and that her counsel's advice was based solely on her welfare; and close questioning of the defendant by the court, the defendant's plea was accepted. *See* Transcript of Mar. 20, 2002 at 35–37.

The government requested an adjournment of sentence to consider potential bases for a downward departure outlined by the court. Both sides submitted briefs on

departure issues, the government contesting the court's power to depart downward.

A presentence report was presented by Probation. The report was significant in that it calculated defendant's offense level differently than the plea agreement. The presentence report indicated that defendant's adjusted offense level would be 24, rather than 20, requiring a minimum sentence of 51 months rather than the 33 months set out in the plea agreement.

## III. Law

### A. Conflicts of Interest

Attorneys are subject to strict rules designed to prevent them from having conflicts of interest with their clients. The American Bar Association Model Code of Professional Responsibility demands that a lawyer "shall not accept [or continue in] employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests." ABA Model Code DR 5–101. This principle is one of the pillars of our judicial system—that an attorney should not have any reservation in giving unalloyed support to the client he is representing. A lawyer constrained by a conflict of interest between attorney and client, or between two or more clients, may be required to withdraw as counsel. ABA Model Rule 1.16. The right to counsel free from conflicts of interest has been enforced by the Supreme Court. *See Holloway v. Arkansas*, 435 U.S. 475, 489–90, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) (right to effective counsel includes right to attorney free from conflicts of interest).

Forfeiture cases may be particularly amenable to conflicts of interest. In these cases, all of a defendant's assets may be seized, preventing the attorney from recovering any fee if the defendant loses. The attorney has a financial incentive to ensure that fees are paid, and thus an incentive to advise a defendant in a manner likely to protect fees—a position which may diverge from the best interests of the defendant.

All forfeiture cases do not raise conflicts per se. *See, e.g., United States v. Monsanto*, 491 U.S. 600, 615, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989) (finding no coercion in forfeiture case). Coercion must be measured by the way the government exercises its power to seize assets. *See, e.g., United States v. Marquez*, 909 F.2d 738 (2d Cir.1990) ("Any attempt to use the prospect of getting the defendant's lawyer paid from seized funds as a bargaining chip to obtain a concession from the defendant poses the potential for a serious conflict of interest."); *cf. Cuyler v. Sullivan*, 446 U.S. 335, 343–45, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) (states may not conduct trials in a way that unconstitutionally impairs a defendant's right to effective counsel).

### B. Plea Bargains

#### 1. Plea Bargaining and Coercion

The Federal Rules of Criminal Procedure allow a defendant to "plead guilty, not guilty, or nolo contendere." F.R.Cr.P. 11(a)(1). Any plea of guilty must be shown to the court to be "voluntary":

> The court shall not accept a plea of guilty or nolo contendere without first, by addressing the defendant personally in open court, determining that the plea is voluntary and not the result of force or threats or of promises apart from a plea agreement. The court shall also inquire as to whether the defendant's willingness to plead guilty or nolo contendere results from prior discussions between the attorney for the government and the defendant or the defendant's attorney.

F.R.Cr.P. 11(d). While the rule warns of coercion as a "result of force or threats or of promises apart from a plea agreement," the court's obligation to determine "voluntariness" is not limited by these examples. The word "voluntary" is itself laden with ambiguity; it is an antonym of "coerced" which may be due to various forms of non-force or non-threats. The second sentence starting with the words, "the court shall also" inquire about prior "discussions," suggests that inappropriate coercion may exist even where there is no "force or threats or ... promises apart from a plea agreement."

There is no single clear definition of "voluntary" for all legal purposes. Even in the criminal-law-plea context, it is unclear whether "voluntary" means freedom from any coercion or whether it means freedom only from "wrongful" or "undue" coercion. A pristine rule of "no coercion" would preclude many plea agreements. Requiring plea negotiations to be free from "any coercion" would contradict the basic notions of bargaining. Contract law theory suggests that no bargaining process is completely devoid of coercion in some form. The problem is one of discerning what level of coercion is so inappropriate as to render a plea agreement invalid.

The seventh edition of Black's Law Dictionary's definition of "voluntary" as something done "unconstrained by interference...not compelled by outside influence," is not helpful in determining whether a guilty plea was "voluntary" since a defendant is always "influenced" by many factors including family demands and other social pressures as well as by the hope of minimizing punishment. To conclude that a plea agreement is made "unconstrained by interference" or "not compelled by outside influence" would be to ignore the reality that such an agreement is a bargain made between a relatively powerless defendant and a prosecutor who can exercise a great deal of influence over the accused's future happiness.

In *Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), the Supreme Court explained that a plea agreement is based upon mutual advantages gained by both the prosecutor and the defendant. If the defendant is "fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel" the plea may be considered "voluntary." *Id.* at 755, 90 S.Ct. 1463. Courts recognize that "a great many [defendants are] no doubt motivated at least in part by the hope or *assurance* of a lesser penalty than might be imposed if there were a guilty verdict after a trial to judge or jury." *Id.* at 752, 90 S.Ct. 1463 (emphasis added).

It is sometimes said that a plea is not "voluntary" if it is obtained through coercion that is "overbearing" to the defendant's will. *Brady,* 397 U.S. at 750, 90 S.Ct. 1463. As noted in *Miller v. Angliker,* 848 F.2d 1312 (2d Cir.1988), a plea is valid "if it is not the product of actual or threatened physical harm, mental coercion overbearing the defendant's will, or the defendant's sheer inability to weigh his options rationally." The words "overbearing" and "sheer inability" imply that some degree of "coercion" does not negate the validity of a guilty plea. Rather, forbidden is only "coercion" that is so overbearing to the defendant's will that he or she cannot make a rational decision. Undue coercion may be "mental as well as physical" and may be the result of "subtle pressures" by the government on a defendant. *Garrity v. New Jersey,* 385 U.S. 493, 495, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).

This flexible approach contradicts the absolute stand against coercion expressed by some courts. *See United States v. Bell,* 776 F.2d 965 (11th Cir.1985) (explaining

the core requirements to a valid plea, including that the "plea must be free from coercion"); *United States v. Dayton,* 604 F.2d 931, 934 (5th Cir.1979) (stating that a guilty plea must be free from coercion); *United States ex rel. Siebold v. Reincke,* 362 F.2d 592, 593 (2d Cir.1966) ("A conviction will not be sustained if it rests upon a plea of guilty which is the result of coercion."). To be avoided, said one court, is "any semblance of coercion." *Euziere v. United States,* 249 F.2d 293, 295 (10th Cir.1957) ("Fundamental standards of procedure in criminal cases require that a plea of guilty to the charge or charges contained in an indictment or information be entered freely, voluntarily, and without any semblance of coercion.").

One court of appeals has realistically declared that a plea is involuntary only if it is obtained through "wrongful coercion." *United States v. Hernandez,* 203 F.3d 614, 619 (9th Cir.2000). This implies that some coercion is implicit in the plea bargaining process and only "wrongful coercion"—however defined—invalidates a plea. That there are acceptable types and degrees of coercion is suggested by a holding that only some activities, such as judges' participation in plea negotiations, are "inherently coercive." *See United States v. Barrett,* 982 F.2d 193 (6th Cir.1992), citing *United States ex rel. Elksnis v. Gilligan,* 256 F.Supp. 244, 254 (S.D.N.Y.1966) (judges participation in plea negotiations is prohibited by Rule 11 of the Federal Rules of Criminal Procedure).

An illegally coerced plea may be analogized to an illegally obtained confession. Some degree of coercion is present in many admissible confessions. One English court summed up the common law rule as follows: "A free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt ... but a confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape ... that no credit ought to be given to it; and therefore it is rejected." *King v. Warickshall,* 1 Leach 262, 263–264, 168 Eng. Rep. 234, 235 (K.B.1783). The due process test of voluntariness in a confession requires the court to consider "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation ... [and] whether the defendant's will was overborne." *Dickerson v. United States,* 530 U.S. 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). Factors to be considered in determining whether the defendant rationally decided to confess include age, education, intelligence, length of detention and questioning, and physical and mental characteristics. *See United States v. Hernandez,* 893 F.Supp 952, 962 (D.Kan.1995), *aff'd, United States v. Hernandez,* 103 F.3d 145 (10th Cir.1996). Even wholly ratiocinatory economic creatures fully capable of adequately weighing the pros and cons of a prospective decision will take into account advantages and disadvantages offered by a prosecutor—in other words their coercive power. The carrot can be no less coercive than the stick—both impose pressure on decision. *Cf.* F.R.Cr.P. 11 (plea must be "voluntary and not the result of force or threats *or of promises* ") (emphasis added).

In addressing confessions as well as pleas, "voluntary" can not be defined by freedom from "coercion," rather than by acknowledging appropriate levels of coercion. Determining whether a confession or plea is the product of illegitimate coercion requires consideration of the state of mind of the defendant as well as the techniques used for extracting agreement. *Cf. Miller v. Fenton,* 474 U.S. 104, 116, 106

S.Ct. 445, 88 L.Ed.2d 405 (1985) ("The admissibility of a confession turns as much on whether the techniques for extracting the statements, as applied to this suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne."). More "coercion" may be allowable in the form of bargained for benefits in pleas than would be allowed in confessions because the plea is developed with counsel's advice and with time to reflect and formalize the decision.

■■■ A closer equivalence to "plea bargains" than confessions is suggested by contract law. *Cf. Brady, supra,* 397 U.S. at 752, 90 S.Ct. 1463 (plea bargains involve "mutuality of advantage"). The law recognizes that some degree of coercion exists in contract formation, but that the level of duress or threat may not be such that a party is "unfairly" (however defined) induced to enter into an agreement.

> Coercion is inherent in the bargaining process itself .... Every contract involves some kind of threat .... The problem is one of singling out those threats that amount to abuse of the bargaining process .... The rules on duress ... allow the injured party to undo the transaction by avoiding it. They seek to restore the parties to the positions in which they found themselves before they made the agreement.

E. Allan Farnsworth, *Contracts* § 4.9 (Little, Brown & Co.1982). Yet there is no equivalence of a bargain between defendant and prosecutor and between entrepreneurs. For example, a party to a contract generally may not induce another party to agree by threat of criminal prosecution, whereas the nature of a plea negotiation is that not consenting necessarily results in further criminal prosecution. *See Jamestown Farmers Elevator, Inc. v. General,* 552 F.2d 1285, 1291 (8th Cir.1977)

("threats to institute criminal or regulatory proceedings ... made in order to secure another's consent to an undeserved bargain for one's own private benefit, may be sufficiently wrongful to constitute duress"); Farnsworth, supra, at § 4.20; *United States v. Bethlehem Steel Corp.,* 315 U.S. 289, 300, 62 S.Ct. 581, 86 L.Ed. 855 (1942) ("The word duress implies feebleness on one side, overpowering strength on the other."); *see also N. Am. Rayon Corp. v. Comm'r of Internal Revenue,* 12 F.3d 583, 589 (6th Cir.1993) ("Undue influence exists where a relationship of control exists between the contracting parties, and the stronger party influences the weaker party in a way that destroys the weaker party's free will and substitutes for it the will of the stronger party."); Commentary to § 175 of the Restatement (Second) of Contracts (a threat that would "arouse such fear as precludes a party from exercising free will and judgment or...[would] induce assent on the part of a brave man or a man of ordinary firmness" is voidable).

■■■ In the context of plea negotiations, a defendant is likely to be in such a state of fear that he or she might in a civil action be considered "bereft of quality of mind essential for making a contract." *Rissman v. Rissman,* 213 F.3d 381 (7th Cir.2000) (citation omitted). A prosecutor's offer suggests "take this offer or I will use every resource at the government's disposal to deprive you of your liberty for as long as possible." This type of coercion is backed by the Federal Sentencing Guidelines. *See* Guidelines Manual § 3E1.1(b)(2) (2001) (defendant's sentence may be decreased by up to 3 levels by "timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently").

"Coercion" and "voluntary" are, in short, vague terms of limited value in deciding whether to accept a plea. The critical question is whether the defendant was in a position to rationally weigh the advantages and disadvantages of the plea and whether a reasonable person in that position might make the same decision. This is a rather imprecise standard. In addition, certain tactics are considered incompatible with the etiquette of criminal justice, including overt threats and physical abuse. In accepting the plea the court must try to be as fully cognizant as practicable of the circumstances leading to the plea and of the nature and the background of the particular defendant, including age, education, social class, family pressures, and other relevant factors that might have affected the decision. The defense attorney's position is critical for he or she provides defendant with the crutch of cool rationality.

"Coercion" within limits is an available tool for prosecutors. It is appropriate so long as it does not shock the judicial conscience and does not depart substantially from commonly held beliefs of what is appropriate pressure for the government to apply to supposed miscreants. "Voluntary" under these circumstances means a capacity of the defendant and his counsel under the circumstances to rationally and fairly weigh the benefits of the plea against risks of not pleading. If "coerced" is too strong a word, one that leaves members of the justice system uncomfortable, many pleas are, to put the matter more politely, "induced" by strong promises of great value (e.g., a lesser term of incarceration, or life rather than death)—offers that, to paraphrase a famous movie line, most defendants cannot refuse.

## 2. Competency to Plead

Voluntariness is comprised of at least two separate elements. First, the plea may not be "coerced" in the sense already described. "The agents of the State may not produce a [guilty] plea by actual or threatened physical harm or by mental coercion overbearing the will of the defendant." *Brady v. United States,* 397 U.S. 742, 750, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). Coercion is a fact-intensive inquiry which will depend on the particular case.

Second, a defendant must be competent to plead. *Saddler v. United States,* 531 F.2d 83, 85 (2d Cir.1976). "If the judge, in response to his Rule 11 inquiries or because of information received from other sources, has reasonable grounds to doubt the defendant's competence, he must refuse to accept the plea or defer acceptance pending a request for an examination of the defendant's mental capacity." *Id.* at 86.

In making these two inquiries, courts are instructed to err on the side of caution and use "the 'utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure [the defendant] has a full understanding of what the plea connotes and of its consequence.'" *Id.* at 85–86, *citing Boykin v. Alabama,* 395 U.S. 238, 243–44, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

There is a lively debate among scholars over whether plea bargaining is systemically unreasonably coercive in nature. *Compare, e.g.,* John H. Langbein, Torture and Plea Bargaining, 46 U. Chi. L.Rev. 3, 12–19 (1978) (plea bargaining is similar to medieval European torture), *and* Stephen J. Schulhofer, Plea Bargaining as Disaster, 101 Yale L.J.1979, 1980 (1992) (plea bargaining should be abolished), *with* Frank H. Easterbrook, Plea Bargaining as Compromise, 101 Yale L.J.1969, 1978 (1992) (plea bargaining is an efficient compromise and maintains defendant autonomy).

Langbein's view, while perhaps overly dramatic, is relevant to the present inquiry. He notes that:

> Like the Europeans of distant centuries who did employ [torture], we make it terribly costly for an accused to claim his right to the constitutional safeguard of trial. We threaten him with a materially increased sanction if he avails himself of his right and is thereafter convicted. This sentencing differential is what makes plea bargaining coercive. There is, of course, a difference between having your limbs crushed if you refuse to confess, or suffering some extra years of imprisonment if you refuse to confess, but the difference is of degree, not kind. *Plea bargaining, like torture, is coercive.*

Langbein at 12–13 (emphasis added). Langbein further notes the irony in requiring that plea bargains be labeled "voluntary" and "not coerced" before they can be approved by a court. "The plea agreement is the source of the coercion," he notes, "and already embodies the involuntariness." *Id.* at 14. His critique is rejected by the American system of criminal justice as it has evolved; it is now firmly bottomed on coercively induced pleas.

### 3. Changes in the Criminal Justice System

When the Sentencing Guidelines were introduced, some judges expressed doubts about their constitutionality and fairness. *See generally United States v. Yu,* 1993 WL 497985 (S.D.N.Y. Nov.30, 1993) (Sweet, J.) (noting problems when guidelines were adopted, including the resignation of one district judge, findings of unconstitutionality by other judges, and a poll indicating that 92% of district judges opposed mandatory guidelines).

One concern of some judges was that if it made no difference to the sentence under the guidelines whether a defendant was tried, or pleaded guilty, then the new process would lead to a substantial increase in the number of criminal trials. Defendants would, it was suggested, have no incentive to plead, since the sentence would be the same under the guidelines.

In fact, just the opposite result occurred. The number of criminal jury trials has radically decreased since the guidelines were implemented. There are now relatively few criminal trials. In the meantime, the number of guilty pleas has increased dramatically. *Cf.* H.R.Rep. No. 93–1508 (1974), reprinted in 1974 USCCAN 7401, 7450 (hereinafter Speedy Trial Act History) (Letter from Attorney General opposing passage of the Speedy Trial Act, arguing that the legislation "would result in a decrease in the number of guilty pleas, since defendants would request jury trials with greater frequency"; in fact, as the statistics below show, the opposite occurred).

One explanation for this largely unforeseen result is based on a series of related factors: The government often works out deals to avoid prosecution or drop more serious charges; 5K.1 letters (which are issued, in accordance with U.S.S.G. § 5K.1 for defendants who cooperate with the government, and which grant a judge broad discretion to depart downward) are issued to many cooperating defendants; the government often does not contest findings of fact essential to lower sentences, such as "cooperation" or "minor role," which can favor defendants; the government does not appeal many downward departures; and the government readily agrees to "safety valve" provisions (guidelines and statutes allowing for sentence reductions for certain defendants who cooperate with government, and for making inapplicable harsh statutory minimums). All of these benefits are available to the pleading defendant rather than to one taking the case to trial. Between

safety valve and other reductions, defendants can often reduce their guidelines calculation by 6 or more levels, in effect cutting many sentences in half or more. *See* Guidelines Manual at 10 ("A change of six levels roughly doubles the sentence irrespective of the level at which one starts."). The message to defendants is clear: "Don't insist on your right to trial." Since the sentencing judges' ability to impose a sentence other than the one the government insists on under the guidelines is sharply reduced, the government's power to induce pleas has been magnified. An officially published 1994 study by the Sentencing Commission, authored by a Sentencing Commissioner and a highly regarded law school professor, noted some of these dangers:

> Guideline factor bargaining remains common, especially with regard to the "role in the offense" guidelines provision. The common pattern is for the AUSA to agree to recommend (or not to oppose) a reduction for minor or minimal role when the facts do not support the recommendation.... The AUSA's interpretation tends to be accepted by the court even if it is factually dubious .... An important vehicle for circumvention [of the guidelines] is the § 5K1.1 "substantial assistance" motion, which often is made on behalf of "sympathetic" defendants who have offered either minimal assistance, assistance that did not bear fruit in the way that § 5K requires, or no assistance at all.

Ilene H. Nagel and Steven J Schulhofer, Plea Negotiations Under the Federal Sentencing Guidelines: An Empirical Examination of the Post-*Mistretta* Experience 22, 23 (1994) (hereinafter "Plea Negotiations Study").

 The power of the prosecutor is particularly enhanced in connection with informers. If the government is satisfied that a putative defendant has made early admissions, particularly if accompanied by a promise to testify against other persons in the criminal enterprise, the government can provide a 5K.1 letter that permits probation for even the most heinous crimes accompanied by a waiver of any minimum sentence. *See* 18 U.S.C. § 3553(e) (court may impose sentence less than mandatory minimum in cases of substantial assistance); Guidelines Manual § 5K1.1, Application Note 1 (waiver of mandatory minimum sentence appropriate in some cases of assistance under § 5K1). The pressure on the informer to shade the truth to assist the government in obtaining convictions of others is enormous. *Cf., e.g., Rothstein v. Carriere*, 41 F.Supp.2d 381 (E.D.N.Y.1999) (case against false informant). While the government does all it can to ensure against false accusations, the use of informers does place greater pressure on informed against defendants to plead guilty. The court must guard particularly against pleas coerced in such situations. (In the instant case there was a strong hint of former employees of defendant informing on her.)

Statistics available from the United States Sentencing Commission illustrate this trend to avoid the guidelines in order to induce pleas. The number of sentences within guideline range has dropped from 82% in 1989 to 64% in 2000. *See* Percent of Offenders Receiving Each Type of Departure 1996–2000, available online at http:// www.ussc.gov/ANNRPT/2000/fig-g.pdf, and Percent of Offenders Receiving Each Type of Departure 1989–1996, available online at http://www.ussc.gov/ annrpt/ 1996/fig-g.pdf. (The figures contained in these tables are included as Appendix 1 of this memorandum; they include a small number of upward departures which are not displayed on the graph because of space constraints). The majority of departures are granted for substantial assistance to authorities. Though the number of other departures has risen in recent

years, it is still less than the number of departures for substantial assistance to authorities. Since substantial assistance departures require a letter from the government, the government has control over whether or not to grant a defendant the single most effective tool for receiving a sentence below the guideline range. No calculation is available of those "within range" only because the charge has been reduced or the application has been manipulated or interpreted to avoid an apparent departure. See discussion below.

There may, of course, be other explanations for the reduction in the relative number of trials besides utilization of the guidelines by the prosecutors to induce pleas—perhaps prosecutions are now those commenced only in the clearest cases of guilt, or perhaps now the mix of cases, emphasizing drug violations or illegal entry into the United States, has increased the ease of successful prosecution.

At the same time that it essentially controls the sentence, the government can often block bail. In some cases this opposition is justified (such as for instances for many foreign nationals who import drugs and are likely to flee). Still, the combination of pretrial incarceration, plus higher periods of potential incarceration after conviction, when compared with a relatively easy plea and a known relatively short period of incarceration, create intense pressure on a defendant to plead. In most cases, this pressure does not result in a serious concern that the innocent are being found guilty.

The 1994 Sentencing Commission study on plea negotiations conceded the existence of problems. Its study stated that "prosecutors exercise a considerable degree of sentencing discretion through charging and bargaining decisions. This discretion, if unchecked, has the potential to re-create the very disparities that the Sentencing Reform Act was intended to alleviate." Plea Negotiations Study at 6. The report further noted that "circumvention" of the guidelines occurs, through bargaining by prosecutors in charging defendants. *Id.* at 7–8. It stated bluntly, "our research uncovered *unequivocal evidence that bargaining and charging practices undercut the sentencing guidelines.* There is simply no way to deny the existence of this problem in every jurisdiction we studied." *Id.* at 17–18 (emphasis in original). Inappropriate use of minor role reductions and § 5K1 letters was found to lead to circumvention of the guidelines. *Id.* at 22–23. "The most important vehicle for guidelines evasion, post-*Mistretta,* is charge bargaining which leads to the dis-

.missal of readily provable counts," *id.* at 23; prosecutors seeking cooperation from defendants sometimes use charge bargaining rather than § 5K1 reductions since § 5K1 "offers inadequate certainty [of reduced sentence]." *Id.* at 30.

Statistics from the Administrative Office of the Federal Courts (some of which are available online through J–Net, at http://jnet/library/judfact/table3–5.htm) seem to indicate that this trend, towards guilty pleas and away from trials, was already underway before the implementation of the guidelines, but that the guidelines have accelerated it. They show that, between 1971 and 2001, the number of criminal defendants convicted in federal district courts rose from 78% of total defendants charged in 1971, and 75% of those charged in the next three years, to 90% of defendants charged in 2001. (Not all of the 10% of those charged but not convicted were acquitted. Dismissal may have taken place for a variety of reasons.)

This ratio of convicted defendants to charged defendants has been driven up in part by large increases in the relative number of guilty pleas. The number of defendants convicted by guilty or nolo contendere plea has increased from 27,544 in 1971 to 64,402 in 2001.

The total number of defendants convicted after jury trial dropped from 3,143 in 1971 (and an average of 3745 for the years 1971–75) to 2,294 in 2001. Significantly, the years immediately following the guidelines saw an increase in the number of defendants convicted after jury trials, from 4,191 in 1988, to 4,640 in 1989, to 4,851 in 1990, to over 5000 each in 1991 and 1992. Since 1992, the number of defendants convicted after jury trials has decreased in every year except one, and the ten years of decreases have halved the number of defendants convicted after jury trials.

Overall, the percent of convictions resulting from guilty plea has increased from 86% in 1971 (27,544 pleas in a total of 32,103 convictions) to 95% in 2001 (64,402 pleas in a total of 67,731 convictions).

The statistics for the district court for the Eastern District of New York are similar. In 1971, the Eastern District had a total of 147 (15.5% of total) defendants convicted after jury trials, and 28(3%) convicted after bench trials, with 773 (81.5% of total) convicted by plea. By 2001, there were only 48 defendants convicted by jury trial and a single defendant convicted by bench trial (3.5% of total) versus 1336 (96.5% of total) convicted by plea.

These numbers should not surprise anyone familiar with the current criminal law system. They are available in part in the Sentencing Commission's Sourcebook. *See* 2000 Sourcebook of Federal Sentencing Statistics, Figure C ("Guilty Pleas and Trial Rates"). (The Sourcebook's numbers for percent of pleas differ slightly from those provided by the Accounting office, varying as much 0.5%; the reason for this slight variation is unknown to the court.)

Numbers of pleas and trials for state courts, while not readily available, are likely to be similar to those for Federal courts. *Cf.* Plea Negotiations Study at 11 (in Minnesota, "the power of prosecutors unquestionably increased" after state sentencing guidelines were adopted; much of the shift is due to increased "charge bargaining" over the nature of charges); *id.* at 12–13 (adoption of Pennsylvania guidelines increased conviction rate; "plea practices in urban areas were altered").

The Advisory Committee Note to Rule 11 of the Federal Rules of Criminal Procedure discusses the issue in passing:

Although reliable statistical information is limited, one recent estimate indicated that guilty pleas account for the disposition of as many as 95% of all criminal cases. ABA Standards Relating to Pleas of Guilty, pp. 1–2 (Approved Draft, 1968). A substantial number of

these are the result of plea discussions. The President's Commission on Law Enforcement and Administration of Justice, Task Force Report: The Courts 9 (1967); D. Newman, Conviction: The Determination of Guilt or Innocence Without Trial 3 (1966); L. Weinreb, Criminal Process 437 (1969); Note, Guilty Plea Bargaining: Compromises By Prosecutors To Secure Guilty Pleas, 112 U.Pa.L.Rev. 865 (1964). . . . Administratively, the criminal justice system has come to depend upon pleas of guilty and, hence, upon plea discussions. See, e.g., President's Commission on Law Enforcement and Administration of Justice, Task Force Report. The Courts 9 (1967); Note, Guilty Plea Bargaining: Compromises By Prosecutors To Secure Guilty Pleas, 112 U.Pa.L.Rev. 865 (1964).

F.R.Cr.P. 11, Advisory Committee Notes to 1974 Amendments.

Following this trend, the number of trials (including criminal jury trials) handled by each Federal judge annually has dropped steadily. In 1992, the average judge handled 32 trials (bench and jury, civil plus criminal) in a year; there were an average of 9 criminal jury trials per year. By 2001, the average judge handled 20 trials in a year; there were an average of 5 criminal jury trials per year. During the same time, the annual number of criminal cases filed per judge rose, from 54 in 1992 to 77 in 2001. The statistics are directly available online (except for the number of criminal jury trials per year); *see* Judicial Caseload Profile, available online at www.uscourts.gov/cgi-bin/cmsd2001.pl, and Judicial Caseload Profile, available online at www.uscourts.gov/cgi-bin/cms.pl. The number of criminal jury trials is derived from the number of judges per year, see citations supra, and the number of criminal jury trials which is available at http://jnet/library/judfact/table4-3.htm. (These figures appear compatible; for example, the numbers of total trials available at the J-Net site corresponds exactly with the numbers of trials per judge available in the CMS statistics).

Over the past 30 years, the number and percentage of defendants convicted and sentenced in Federal courts has increased dramatically, both nationally and within this district. The following charts illustrate these patterns.

432

Corresponding changes to the number of defendants acquitted further illustrate this trend.

**Percent of Total Defendants Not Convicted, 1971–2001**

■ Nationwide ▨ Eastern District of New York

These numbers are related to the increase in guilty pleas taken, both in total number and as a percent of convictions. As both the total and relative numbers of guilty pleas have increased, the number of trials has decreased, both in total and relative terms, while the number of criminal cases per judge has increased.

**Caseload Per Judge, Nationwide, 1992–2001**

■ Criminal Filings
▨ Completed Trials, Civil Plus Criminal
☐ Criminal Jury Trials

As the above chart demonstrates, while Federal judges have seen an almost 50% rise in criminal cases per judge, from 54 to 77 per year in the last 10 years, they have

also observed the total number of trials (bench and jury, civil and criminal) drop by more than a third, from 32 to 20; the number of criminal jury trials has dropped by nearly half. (For display purposes, this chart is rounded to the nearest whole numbers (9 trials per year for 1992 and 5 for 2001); calculations of decrease are not helpful with these rough numbers. An exact calculation can be made using the more precise numbers of 8.84 for 1992 and 5.05 for 2001, accurately showing a 43% decrease in the number of criminal jury trials per judge since 1992.)

When examining the criminal justice system in its report on the Speedy Trial Act the House Judiciary Committee noted the danger signal flashed by our increased reliance on pleas. It declared:

Whether the negotiated plea is a desirable element within the system or one of the basic causes of delay and court-clogging is another question. The National Advisory Commission in its *Courts* report found that plea bargaining constitutes a triple danger to the system:

(1) *Danger to the Defendant's Rights*—A survey of more that 3,400 criminal justice practitioners in four states—California, Michigan, New Jersey, and Texas—revealed that 61 percent of those polled agreed that it was probable or somewhat probable that most defense attorneys engage in plea bargaining primarily to expedite the movement of cases. Furthermore, 8 percent agreed that it was probable or somewhat probably that most defense attorneys in plea bargaining negotiations pressure clients into entering a plea that the client feels is unsatisfactory.

(2) *Danger to Court Administration*—Very simply, the Commission found that plea bargaining resulted in the need to pull cases out of the process—sometimes on the morning of trial—making efficient scheduling of cases difficult or impossible. Thus, plea bargaining makes it difficult to use judicial and prosecutorial time effectively.

(3) *Danger to Society's Need for Protection*—The conclusion of the commission in this regard is that, because defendants are often dealt with less severely than might normally be the case, plea bargaining results in leniency that reduces the deterrent effect of the law and may have a less direct effect on corrections programs.

Speedy Trial Act History at 7412 (emphasis supplied). Because of these factors, the Commission recommended the prohibition of plea bargaining. *Id.* Rejecting this radical recommendation, the House Committee suggested only that the report deserved "weight."

The Sentencing Commission found that the result of "charge bargaining" by prosecutors was that "the amount of [sentence reduction] is taken out of the hands of the judge, where the Guidelines intended to place it, and left more under control of the prosecutor, where neither the Congress nor the Commission intended the discretion to be." Plea Negotiations Study at 30–31.

Most pleas of guilty are fully justified. There is often clear evidence of guilt. Often the defendant agrees on his or her guilt at the time of arrest. The catharsis of prompt acknowledgment of wrongdoing and its potential first step on the road to rehabilitation should not be underestimated as a value of the truly "voluntary" plea.

Occasionally, as in the case at hand, the coercive nature of the system is such as to give serious cause for concern that we are utilizing excessive coercion to avoid trials. Yet, there is no injustice on any appreciable scale through conviction of the innocent that can be demonstrated. Neither

prosecution nor defense, nor the trial nor appellate courts, seem blameworthy. Nevertheless, the end result of the "new criminal justice system" in almost eliminating trials is disquieting. Such massive shifts may in practice require development of new judicial techniques, ethical rules or attitudes. *Cf., e.g.* Mae C. Quinn, Whose Team Am I on Anyway?, 26 Rev. L. Soc. Ch. 37, 38 (2001) (noting new model of "teamwork" between judge, prosecutor, and defense in drug cases, requiring change in attitude of defense counsel towards client and court).

### C. Bail

#### 1. Law Governing Bail

Bail in Federal courts is governed by section 3142 of Title 18 of the United States Code. Section 3142 establishes a general policy of release of prisoners pending trial. Prisoners may be released on their own recognizance (subsection (b)) or on conditions (subsection (c)). Only if, after conducting hearings, the judge decides that release presents a danger to the security of the public or that "no condition or combination of conditions will reasonably assure that appearance of the person as required," may the defendant be detained without bail. 18 U.S.C. § 3142(e). This provision codifies the longstanding norm in our justice system that bail is the rule, and that few cases are to be exceptions. The Constitution itself prohibits the use of excessive bail. U.S. Const. Am. VIII.

"At common law in England pretrial release on bail was a matter within the discretion of judges for all defendants." *United States v. Melendez–Carrion,* 790 F.2d 984, 997 (giving history of bail under common law, citing authorities including Blackstone). This common law tradition was continued by the Judiciary Act of 1789, creating a right to bail in all but capital cases, where the court had the option of non-release. Jud. Act of 1789, Ch.

20, 1 Stat. 91 (1789), cited in *Melendez–Carrion, supra.*

Later changes in the law made all prisoners subject to bail requirements. The basic theory of freedom before conviction, however, never changed. As the Supreme Court reiterated in *Stack v. Boyle,* 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3 (1951):

> From the passage of the Judiciary Act of 1789, 1 Stat. 73, 91, to the present Federal Rules of Criminal Procedure, Rule 46(a)(1), 18 U.S.C.A., federal law has unequivocally provided that a person arrested for a non-capital offense shall be admitted to bail. This traditional right to freedom before conviction *permits the unhampered preparation of a defense,* and serves to *prevent the infliction of punishment prior to conviction.* Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning.

Id. at 4, 72 S.Ct. 1 (Emphasis added).

#### 2. History of Bail Reform

Despite these protections, many poor defendants were often unable to make bail. A disparity based upon social status led to widespread dissatisfaction. Public interest organizations urged increased release before trial.

There were several reasons why bail reform was urged. A primary concern was that expressed by the Supreme Court earlier in *Stack,* that defendants who are held in pretrial custody are less able to defend themselves. *Stack,* 342 U.S. at 4, 72 S.Ct. 1. This correlation was shown in several studies prior to passage of the Bail Reform Act in 1964. *See, e.g.,* Anne Rankin, The Effect of Pretrial Detention, 39 N.Y.U. L.Rev. 641 (1964). Ms. Rankin, a Research Associate from the Vera Institute, relied upon data from New York. She pointed out that "previous studies of

bail have indicated that an accused who has been detained in jail between his arraignment and the final adjudication of his case is more likely to receive a conviction or a jail sentence than an accused who has been free on bail." *Id.* at 641. She used standard statistical techniques to attempt to neutralize the effect of other variables. An initial reading of the statistics showed that for the period in question, sixty-four percent of non-bailed defendants were sentenced to prison time, while only seventeen percent of bailed defendants were sentenced to prison. *Id.* at 643. This difference of forty-seven percent was largely attributable, the study concluded, to the different decisions made on bail. Factors one might think would cause a difference, such as the race of the defendant and the type of offense charged, were not statistically significant. *Id.* at 644. Rankin identified five factors which did have a statistical correlation with disposition: defendant's previous record, the bail amount, type of counsel, family integration, and employment stability. *Id.* at 644–45. After controlling for each of these variables, the study found that for sizable numbers of defendants, the decision between bail and pretrial detention still accounted for a difference unfavorable to those unreleased of thirty-five to thirty-seven percent in final disposition. *Id.* at 654. Based on these findings, the study concluded that "a causal relationship exists between [pretrial] detention and unfavorable disposition." *Id.* at 655.

Similar finding were developed in other studies. *See, e.g.,* Charles E. Ares *et al.,* The Manhattan Bail Project, 38 N.Y.U. L. Rev 67, 84 ("The 1960 figures support the proposition that a person not in jail at the time of adjudication stands a better chance of receiving a favorable disposition of his case."). "Released defendants fare better than those who remain in jail" because, among other things, "such a defendant is able to assist in the preparation of his own defense." *Id.* at 90. These studies supported the 1964 Bail Reform Act. The House Committee on the Judiciary took testimony from representatives of the Vera Foundation on the subject. Federal Bail Reform Hearings at 85 (colloquy between Mrs. Katzive of the Vera Foundation and Representative Corman of the House Committee).

One of the key statements during the floor debate on the bill was made by Representative William McCulloch of Ohio:

> Freedom between arrest and criminal trial is a safeguard which cannot, in my judgment, be seriously questioned. Other witnesses doubtless will detail these beyond my brief remarks here. Most immediately, however, the necessity for freedom within which to prepare a defense to criminal charge, in the matter of locating witnesses and establishing evidence, may be more important to ascertainment of truth than provision of counsel or a free transcript of trial on which to appeal. An indigent's right to counsel is absolute, as is the transcript; yet pretrial freedom is too often needlessly denied.

Hearings on H.R. 3576, H.R. 3577, H.R. 3578, H.R. 5923, H.R. 6271, H.R. 6934, H.R. 10195 and S. 1357 before the House Committee on the Judiciary, Federal Bail Reform, Mar. 9–16, 1966 (hereinafter "Federal Bail Reform Hearings") at 16 (statement of William McCulloch). Representative McCulloch's statement was made in the context of his support for bail availability to indigents. The same concern— the necessity for "freedom within which to prepare a defense to criminal charge"— applies whether the defendant is being held in custody for inability to pay bail, of for any other reason. The end result of lack of freedom is a greatly hampered ability to prepare for trial.

Similar views were expressed by Senator Sam J. Ervin of North Carolina, who sponsored the Bail Reform bill. Senator Ervin remarked that individuals unable to make bail "are forced to remain in jail, sometimes for many months, until their trial. In jail ... they are severely handicapped in the preparation of their defense. They may not secure evidence, locate witnesses, or aid their attorneys." Federal Bail Reform Hearings at 18 (statement of Senator Sam J. Ervin). *See also id.* at 35 ("The inability to meet bail requirements severely handicaps the accused in the preparation of his defense.") (statement of Representative Roy H. McVicker).

Rufus King on behalf of the American Bar Association declared that,

> Incarcerating people before trial goes against all of our current efforts to separate the innocent from the guilty and to assure every person who is caught up in the machinery of justice a fair trial.... To put an accused person, for long periods into [pretrial detention in jail] so that he cannot defend himself, so that he suffers all the humiliation and the disabilities of being incarcerated, is a totally unworkable alternative if there is any other.

Federal Bail Reform Hearings at 39 (statement of Rufus King).

The legislators were concerned about studies showing the increased likelihood of unfavorable disposition for defendants denied bail. Then-retired Director of the bureau of Prisons, James v. Bennet, reported to the committee that "the person released while awaiting trial has a better chance for acquittal or probation than he who waits in jail." Federal Bail Reform Hearings at 41 (report of James V. Bennett).

The District of Columbia bail statutes were amended in 1970. These amendments allowed detention of certain defendants based on a finding of potential dangerousness. The changes were attacked by many academics. *See, e.g.,* Lawrence Tribe, An Ounce of Detention, 56 Va. L.Rev. 371 (critiquing 1970 changes).

The national bail laws were amended in 1984. The bail reform provisions of the crime control statute passed in 1984 were part of a massive crime control statute which included, among other things, the statutory authorization for the Sentencing Guidelines. Similar to the District of Columbia code, the Bail Reform Act of 1984 was designed to allow judges discretion to deny bail in the case of dangerous defendants. The 1984 Act's legislative history suggests Congressional concern with dangerous defendants. The Act was designed to address "the problem of how to change current bail laws to provide appropriate authority to deal with dangerous defendants seeking release." *See* S.Rep. No. 225, 98th Cong., 1st Sess. 8 (1983), Reprinted in 1984 U.S.Code Cong. & Ad. News 3182, 3189 (Senate Report on the bail portion of the 1984 Crime act) (hereinafter 1984 Act History). The legislative history contains no mention of Congressional repudiation of its earlier aims in the 1964 Act, which included the need to enable defendants to prepare adequately for trial.

The 1984 Act dealt with a very different kind of defendant than Ms. Hebroni—the currently dangerous defendant. No one has suggested that Ms. Hebroni is or was dangerous after her indictment and seizure of her business and assets. Thus the concerns expressed about excessive bail in the history of the prior legislation cannot be ignored in a case such as hers.

In sum, the bail provisions as now written authorize the detention of defendants without bail only for a severely restricted class of defendants for whom no amount of bail would suffice to assure their appearance, and for a small group of defendants

who present a danger of criminal activity while they await disposition of criminal charges against them. The presumption in favor of bail—the "traditional right to freedom" of which the *Stack* court spoke—has remained in force. The need for a general policy of release has remained the same: With narrow exceptions, defendants should be released in order to be able to adequately prepare their defense.

### 3. Constitutional Requirements

■ Like all other criminal statutes, bail provisions are implicitly subject to limitations of due process. The Constitution operates as the backdrop against which criminal statutes and rules function. The statute provides that a person may be detained if no conditions would assure appearance or ensure community safety; implied is the constitutional requirement that due process not be offended. *See, e.g., Doe v. Dept. of Public Safety ex rel. Lee*, 271 F.3d 38, 59 (2d Cir.2001). Because of this constitutional limitation, the statute must be read as authorizing detention only where a due process analysis finds such detention acceptable.

■ The Constitution, in its guarantee that excessive bail should not be required, established the default rule that defendants should not be detained prior to trial unless necessary. This is because the right to freedom before conviction is basic. Similarly, the right to release on bail is inextricably related to the presumption of innocence of an accused. "Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning." *Stack*, 342 U.S. at 4, 72 S.Ct. 1. *See also* 18 U.S.C. § 3142(j) ("Nothing in this section [Bail Reform Act of 1984] should be construed as modifying or limiting the presumption of innocence.").

■ Even fundamental rights such as the right to freedom may be limited if there is a compelling state interest. *Cf. United States v. Edwards*, 430 A.2d 1321 (D.C.Cir.1981) ("Regardless of whether the right to bail is characterized as fundamental or not, the legislative history provides ample support for a compelling state interest in the pretrial detention of the narrow class of persons covered by the statute."). The *Edwards* decision, made in the context of pretrial detention of dangerous persons, was a precursor to the Bail Reform Act of 1984. *See* 1984 Act History at 3191 (Senate Report on the bail portion of the 1984 Crime act).

Assuring the presence of a defendant at trial is a compelling interest, but infringements of basic rights, in the name of compelling interests, must be narrowly tailored. For example, defendants should be denied their freedom only where the trial court has a basis for its finding that detention is clearly necessary to ensure presence at trial.

Government also has an interest in acquitting innocent defendants and a corollary interest in assuring that all defendants have time and conditions that will allow for the defense necessary in our adversarial system. If either side has too great a systemic advantage, then the fairness of the system itself is at risk. American courts may not balance the equation by engaging in the more active roles available under the inquisitorial continental judicial systems. *See generally* Ellen E. Sward, Values, Ideology, and the Evolution of the Adversarial System, 64 Ind. L.J. 301, 302 (1988) (background of adversarial system as "characterized by party control of the investigation and presentation of evidence and argument, and by a passive decisionmaker who merely listens to both sides and renders a decision based on what she has heard").

Finally, the analysis of bail must take into account the seismic modifications of

the criminal law which have occurred in the last few decades. These changes were examined above in some detail in the analysis of plea bargaining. See Part III.B.3 *supra*. The major shift is that there are now significantly fewer trials and more pleas. This alteration could mean different things in the bail context. One possible change is that defendants might need the freedom bail provides in order to effectively prepare a defense—not for trial, but rather as a starting bargaining position in plea bargaining. Where a court denies bail it places defendant in a weaker bargaining position in constructing the plea bargain which will largely determine the sentence.

### 4. Use of Pretrial Services

In considering whether bail is appropriate judges in this district take into account the close supervision of bailed defendants by Pretrial Services. Congress created this organization to ensure that while bail was granted wherever practicable, it did not result in defendants becoming fugitives. 18 U.S.C. §§ 3153, 3154. Pretrial Services was established by statute in 1974 as an experiment under the Speedy Trial Act. Speedy Trial Act History at 7420. The program was implemented in ten districts across the nation, with five districts, including the Eastern District of New York, creating an independent Pretrial Services Board, and five districts creating a Pretrial Services division within their Probation department. The experiment was conducted to determine whether Pretrial Services would better function as an independent court agency, or as a subagency within Probation. The Director of the Administrative office was to track the success of Pretrial Services and report to Congress annually. *Id.; see also id.* at 7437–39 (statements by Director of Administrative Office and Judge Zirpoli).

By 1982 there was broad consensus on the utility of some form of pretrial services. *See* Senate Report No. 97–77, Pretrial Services Act of 1982, reprinted in 1982 USCCAN 2377, 2380–82 (lower rearrest rates, better control by courts, and money savings). Both probation-controlled and independent pretrial services conferred sizable benefits.

The Eastern District of New York is a special district with Pretrial Services independent of probation. *See generally* Minutes to Board of Judges Meetings, June 1980, December 1983, and September 1993 (establishment of pretrial services in this district). This organization has an excellent record. It helps keep bail violations resulting in the absconding of defendants rare to the vanishing point, while at the same time assisting in presentence rehabilitation. *See United States v. Blake,* 89 F.Supp.2d 328 (E.D.N.Y.2000) (rehabilitation before sentencing should be encouraged). Nevertheless, the prosecutor's power to successfully oppose bail—at the trial and appellate level—for those who will not cooperate or plead, suggests the enormous influence of the government on bail as well as on pleas and sentences.

### D. Speedy Trial

### 1. Constitutional Aspects

■ The right to a speedy trial is guaranteed by the Constitution. *See* U.S. Const., Am. 6 ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."). Where a defendant's right to a speedy trial is threatened, courts are to use "a balancing test . . . to approach speedy trial cases on an ad hoc basis." *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Four factors of this test are: "length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.*

 "In addition to the general concern that all accused persons be treated according to decent and fair procedures, there is a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused." *Id.* at 519, 92 S.Ct. 2182. *See also* American Bar Association Model Code of Judicial Conduct, Canon 3, B(8) ("a judge shall dispose of all judicial matters promptly, efficiently, and fairly"). Indefinite detention of non-convicted persons is a violation of the Constitution. *See Zadvydas v. Davis,* 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001).

## 2. Statutes and Rules

The Speedy Trial Act was passed in 1974 in order to ensure that defendants right to a speedy trial was enforced. The Act, now codified in sections 3161 et seq. of Title 18 of the United States Code, states at the outset that courts are to "assure a speedy trial." 18 U.S.C. § 3161(a). In general, no defendant may be held before trial more than 90 days. 18 U.S.C. § 3164. Certain endemic and other delays are not factored into this calculation. 18 U.S.C. § 3161(h).

The legislative history of the Act shows that it was designed to satisfy a variety of purposes. It was "to assist in reducing crime and the danger of recidivism by requiring speedy trials and by strengthening the supervision over persons released pending trial." Speedy Trial Act History at 7402. Such a law was necessary, the House Committee felt, "in order to give real meaning to the Sixth Amendment right [to a speedy trial]." *Id.* at 7404. The committee recognized an earlier suggestion of district-by-district reform through the use of local rules, but decided that such a system would not sufficiently guarantee speedy trials. *Id.* at 7406.

The House Committee was concerned that jail time would disrupt family life, retard rehabilitation, and punish the innocent; significantly, the Committee also relied upon the fact that pretrial detention, "hinders the defendant's ability to gather evidence, contact witnesses, and otherwise prepare his case." *Id.* at 7408. "Both the defense and prosecution rely upon delay as a tactic in the trial of criminal cases," the committee noted. *Id.* at 7407–08. "The right to a speedy trial belongs not only to the defendant, but to society as well." *Id.* at 7408. The House Committee favorably cited the remarks of then-Assistant Attorney General William Rehnquist that, "criminal cases must be tried within a particular period of time." *Id.* at 7414.

Legislative history reveals that there was some support for making the 90–day limit absolute. While the suggestion did not become law, it indicates the concern of Congress for defendants detained for long periods of time. *See United States v. Melendez–Carrion,* 790 F.2d 984 (2d Cir.1986) (providing additional legislative history of Speedy Trial Act).

### E. Sentencing

This case raises issues in several distinct areas of the law of sentencing, including departure, fines, and terms of supervised release.

#### 1. Departure

 In sentencing courts had broad discretion at common law to tailor sentences appropriate to a particular crime and defendant up to the maximum fixed by statute. Alleged disparate sentences (especially in the form of supposed harsher sentences given to minorities) and the urge to increase punishments supported changes. *See, e.g.* Marvin Frankel, Criminal Sentences: Law Without Order (1972) (critiquing sentence disparities). Passage

in 1984 of legislation authorizing Sentencing Guidelines, and the subsequent issuance of the Sentencing Guidelines in 1989, did reduce judicial discretion. *See generally Koon v. United States,* 518 U.S. 81, 95–96, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (background of Sentencing Guidelines). In general a departure from the guidelines on any ground not considered by the sentencing commission in establishing the guidelines is permitted. *See, e.g., United States v. Moe,* 65 F.3d 245 (2d Cir.1995). If a factor was considered in drafting or amending the guidelines, but not given enough weight for particular special circumstances (and so is present "to an exceptional degree") departure is permitted. *Koon,* 518 U.S. at 95–96, 116 S.Ct. 2035. This limited freedom of the court is sometimes described as covering circumstances which take a case out of the "heartland" of the guidelines. *Id.*

█ A court may depart on its own motion even if the parties do not move for departure. *See, e.g., United States v. Arize,* 792 F.Supp. 920 (E.D.N.Y.1992); *United States v. Ramirez,* 792 F.Supp. 922 (E.D.N.Y.1992). The fact that the defendant concedes in her plea agreement that a certain level of the guidelines is appropriate does not bind the court. Discussed below are reasons for departure that might be applicable in the instant case.

### a. Destruction of Livelihood

█ The court may depart downward where defendant's business has been destroyed, preventing re-entry into criminal life. *United States v. Gaind,* 829 F.Supp. 669 (S.D.N.Y.1993) (Broderick, J.) (downward departure where defendant EPA tester's livelihood was destroyed and he could not re-enter the testing profession to engage in more criminal activity). This basis for departure is not encouraged where the evidence does not show that defendant is barred by the destruction of

business from committing similar future criminal acts. *Lieberman v. United States,* 839 F.Supp. 263 (S.D.N.Y.1993) (Broderick, J.) (no downward departure on destruction of livelihood grounds for pharmacist who dealt drugs; destruction of pharmacy business did not prevent future illegal drug dealing).

The instant case lies between *Gaind* and *Lieberman.* The defendant's business has been seized by the government and its assets will be forfeited pursuant to the plea. In addition, defendant has been ordered not to engage in the jewelry or rare metals business during her term of supervised release. See section III.E.4, *infra* (discussion of supervised release). Defendant's livelihood is gone, and with it any chance to immediately begin similar criminal money washing activity. While she is not barred permanently by a licensing or other like inhibition as was the *Gaind* defendant, her situation fits the *Gaind* pattern. The purposes of the guidelines, protection of the public and deterrence of crime, are independently met through the destruction of the defendant's business. As the *Gaind* court put the matter: "Because of the destruction of the defendant's . . . business, the necessity for achieving the purposes of sentencing through sentencing itself [i.e. prison time] has been reduced." *Gaind* at 671. All defendants assets have been taken. During her term of supervised release, she will be prohibited from engaging in trading in precious metals and will not be permitted to reside in Panama. This sufficiently prevents future criminal activity which depended in the past on her large international financial transactions. The fact that she will probably be promptly deported and thus unsupervised during her term of "supervised release" does not lift the court imposed inhibitions; the court may consider the defendant's background in concluding

that she is unlikely to violate her supervised release terms.

### b. Stress of Pretrial Incarceration

■ A court may depart if the defendant has suffered from unusual stress due to a lengthy or particularly stressful incarceration. *United States v. Ekwunoh*, 888 F.Supp. 369 (E.D.N.Y.1994); *United States v. Hoffenberg*, 1997 WL 96563 (S.D.N.Y. March 5, 1997).

In some instances, lengthy pretrial incarceration, and the stress and uncertainty which accompanies such lack of freedom, may be a factor removing a case from the "heartland" of the guidelines sufficiently to warrant departure. For example, in *Ekwunoh*, the defendant was in pretrial detention for two and a half years. *Ekwunoh*, 888 F.Supp. at 373–74. During this time, her case was subject to various appeals. *Id.* In addition, her family situation deteriorated because of her incarceration. The court pointed out the effect of the lengthy incarceration, stating:

> At her resentencing, it was evident that four years of litigation and two-and-one-half years of incarceration had taken a severe toll on Caroline Ekwunoh. Once a prepossessing, articulate woman, she was at her November 28 appearance emaciated, inarticulate, with a visible tic and an expression that can only be described as a permanent cringe. Due to the labyrinthine operations of the sentencing system, this mother of three has faced ongoing uncertainty and dashed hopes for more than two years.

*Id.* at 373–74. The effect of her pretrial incarceration was sufficient to remove that case from the heartland of the guidelines, and a departure was granted. Similarly, in *Hoffenberg*, Judge Sweet found ground for departure in, among other things, "the lengthy and complex criminal and civil charges [defendant] has faced." *Hoffenberg*, 1997 WL 96563 at *12.

Departure is not appropriate as a blanket rule in all cases where there has been pretrial detention of any length. The cases which have granted departure on this ground have done so based on findings of lengthy and complex cases and physical deterioration of a defendant, as well as synergy adverse to the defendant created by the interaction of lengthy pretrial incarceration and other grounds such as exceptional family circumstances. All of these elements are present in the instant case.

■ As with many other grounds for departure, application of this ground requires some attempt by the sentencing judge to appreciate the defendant's situation and feelings. It is wrongly believed by some that the word empathy—according to Webster's Third New International Dictionary (1986), "the capacity for participating in or a vicarious experiencing of another's feelings, volitions or ideas" (and thus the predicate for implementation of the Golden Rule), was expurgated from the lexicon of Federal judges by the Sentencing Guidelines. Such a sentiment would be mistaken; as a Justice of the Supreme Court observed, "compassion need not be exiled from the province of judging." *DeShaney v. Winnebago Co. Dep't of Soc. Svcs.*, 489 U.S. 189, 212, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (Blackmun, J., dissenting). It would be hard to believe that banning a compassionate interest in avoiding unnecessary cruelty to defendants is the rule of our otherwise generous American society. As the Home Secretary of Great Britain, R.A. Butler, among others, put it, "the mood and temper of the public with regard to the treatment of crime and criminals is one of the unfailing tests of the civilization of a country." *See* Roy Jenkins, Churchill, A Biography 190 (2001). A similar observation was made by Fyodor Dostoyevsky, who declared that "the degree of civilization in a society is revealed

by entering its prisons." F. Dostoyevsky, *The House of the Dead* 76 (C. Garnett trans., 1957). The Supreme Court has recognized that this humane vision lives. *See Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (placing reliance on trial judge's judgment in allowing departure).

■ Requiring Federal judges to apply the sentencing guidelines mechanically, without trying to fathom the defendant's heart and mind, is also questionable because it threatens a devastating effect on the judges themselves—the destruction of their humanity. *Cf. United States v. Yu*, 1993 WL 497985 (Sweet, J.) (judges must "consider ... the applicability of the Nuremberg principles of personal responsibility to this arbitrary and ministerial act [sentencing by the Guidelines] dictated by Congress"); *see also United States v. Johnson*, 964 F.2d 124 (2d Cir.1992) ("The United States Sentencing Guidelines do not require a judge to leave compassion and common sense at the door to the courtroom."). The effect of a rule of law squeezing judgment of the trial judge out of sentencing creates risks to the system and those who serve it out of all proportion to the claimed benefits. It cannot be that each time a judge exercises power to depart, the Sentencing Commission or appellate courts will further corral that discretion with more detailed rules to eliminate future judgment and choice. To do so would be to turn the celebrated heartland of sentencing guidelines into a heartless and barren area of our law.

### 2. Fine

The amount defendant may be fined under the statute is $500,000 or double the amount of money involved in the crime, which in this case is $948,000 (double the plea amount of $474,000).

The Sentencing Guidelines recommend that an offender with an offense level of 18

receive a fine of between $6,000 and $60,000. Guidelines Manual § 5E1.2(c)(2). This limit is inapplicable in the instant case since the defendant has been convicted of a crime with a maximum fine of greater than $250,000. Guidelines Manual § 5E1.2(c)(4).

The Guidelines state that "in determining the amount of the fine, the court shall consider:

(1) the need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;

(2) any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources;

(3) the burden that the fine places on the defendant and his dependents relative to alternative punishments;

(4) any restitution or reparation that the defendant has made or is obligated to make;

(5) any collateral consequences of conviction, including civil obligations arising from the defendant's conduct;

(6) whether the defendant previously has been fined for a similar offense;

(7) the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed; and

(8) any other pertinent equitable considerations.

The amount of the fine should always be sufficient to ensure that the fine, taken

together with other sanctions imposed, is punitive."

Guidelines Manual § 5E1.2(d).

### 3. Credit for Good Behavior

Section 3624(b) of Title 18 of the United States Code provides for early release of prisoners who have displayed exemplary compliance with institutional disciplinary regulations. For each year a prisoner has been in custody, he or she may be credited with up to 54 days toward a prison sentence, subject to the determinations of the Bureau of Prisons that the prisoner deserves such a credit; in the final year of incarceration, the good-behavior credit is prorated. *Id.* Pretrial incarceration is entitled to this credit.

The Bureau of Prisons may also, if practicable, place a prisoner into "pre-release custody" for a reasonable portion of the last ten-percent of a prison sentence, not to exceed 6 months. The pre-release custody, which may include home confinement, affords the prisoner the opportunity to adjust and prepare for re-entry into society. 18 U.S.C. § 3624(c).

### 4. Supervised Release

A court may impose a term of supervised release following incarceration. 18 U.S.C. § 3583. During this period, defendant's behavior may be restricted by conditions. *Id.* Statutory conditions prohibit defendants under supervision from committing additional crimes, and possessing controlled substances or firearms. 18 U.S.C. § 3583(d). For the crime that defendant pleaded guilty to, a term of supervised release of up to three years may be imposed. 18 U.S.C. § 3583(b).

■ "Sentencing courts have broad discretion to tailor conditions of supervised release to the goals and purposes outlined in [the Guidelines]." *United States v. Abrar,* 58 F.3d 43, 46 (2d Cir.1995). As long as the terms of supervised release are related to the sentence, and involve "no greater deprivation of liberty than is reasonably necessary" for sentencing purposes, a court may issue "any ... condition it considers to be appropriate." 18 U.S.C. § 3583(d); *see also* 18 U.S.C. § 3553(a) (factors courts should consider at sentencing); *Abrar, supra,* 58 F.3d at 46 (district court's conditions of supervised release will be reviewed only for abuse of discretion).

■ Supervised release may impose restrictions on a defendant's behavior which might not be allowed for other citizens. "Supervised release requires a defendant to alter his or her behavior, but compared to imprisonment, the conditions of supervised release impose a very minor infringement on a defendant's liberty. Simply put, individuals on supervised release are not entitled to the same liberties as others who have not been determined to need supervision." *United States v. Crea,* 968 F.Supp. 826, 829 (E.D.N.Y.1997). For example, a defendant may be properly prohibited from associating with other felons. *See Crea, supra.* The *Crea* court lists other conditions which have been upheld by various courts:

> *United States v. Phaneuf,* 91 F.3d 255 (1st Cir.1996) (defendant convicted of credit card fraud prohibited from incurring extension of credit without permission from probation department); *United States v. Peppe,* 80 F.3d 19 (1st Cir. 1996) (defendant convicted of making extortionate extensions of credit required to have any new credit charges or credit lines reviewed by probation officer); ... *United States v. Johnson,* 998 F.2d 696 (9th Cir.1993) (defendant ordered to abstain from alcohol because of personal and familial history of substance abuse, and proceeds of crimes used to buy alcohol); *United States v. Mills,* 959 F.2d 516 (5th Cir.1992) (defendant convicted

of altering odometers prohibited from participating in car business). *Crea* at 833; *see also id.* at 830 ("In *United States v. Bolinger*, 940 F.2d 478 (9th Cir.1991), the court upheld a condition of supervised release prohibiting the defendant's participation or membership in motorcycle clubs."). *But cf. United States v. Sofsky*, 287 F.3d 122 (2d Cir.2002) (setting aside district court decision banning child pornographer from accessing a computer or viewing television during supervised release). The *Sofsky* court was concerned about the free speech aspects of the prohibition; it was the daily activities of using the mail, phone, or "reading the newspaper" to obtain information rather than business activities, that the court of appeals protected. *Sofsky* at 125.

### IV. Application of Law to Facts

#### A. Defendant's Ability to Plead

■ The defendant's ability to "voluntarily" enter into a plea agreement was affected by her bail situation as her trial grew increasingly closer. The adverse effect on defendant has been apparent.

An example of stresses on her was produced by separation from her only child. Defendant's young son traveled from Israel to New York; he was to live with defendant and other family members prior to her trial if she complied with the bail decision of the trial court under supervised conditions, similar to strict house arrest. Her affection for her son, and the difficulty that the separation caused because of her detention was apparent.

Living with her son was part of the highly restrictive bail package this court approved on February 12, 2002. It was designed to satisfy the demands of the appellate court that bail be related to appearance at trial; the package satisfied this court that defendant would be likely to appear at trial. The court was also aware of other important considerations. Contact with her son would have been therapeutic for a woman now incarcerated a year and a half pending trial, whose trial was only a month away. Defendant's deterioration placed in jeopardy her ability to prepare effectively for trial, including her mental ability to make important decisions. Instead of any family contact, the defendant was then subjected to an emotionally wrenching thwarted near-reunion.

It was under a combination of trying circumstances that defendant decided to plead. She agreed to plead guilty to charges which would lead to a sentence of 33 to 47 months in prison. She also agreed that she would not request a downward departure—a routine clause in such agreements.

Rule 11(f) makes clear that a plea may be accepted where there is a "factual basis" for it. The court is not required to believe that the defendant is actually guilty, or even likely to be found guilty. The documents so far produced in court do not convincingly establish guilt. Nevertheless, the admission of guilt when combined with the proffers of the government of what cooperating witnesses will say and the huge number of boxes of documents, which may or may not contain authenticable incriminating records, provide a factual basis for the plea which satisfies Rule 11(f). The court is not prepared to conclude on the basis of what it has examined that defendant is likely to be guilty. It decides merely that Rule 11(f)'s standard of a "factual basis" has been met so that the plea may be accepted.

#### B. Conflicts of Interest

■ At the time defendant's counsel were originally retained, their representation was not marred by a conflict of interest. Even though incarceration may have hampered her counsel's ability to effective-

ly advise defendant regarding a plea agreement, it did not create a conflict.

More serious was the government's declared intent to take title to all of defendant's funds, and to withhold her assets from use as attorneys fees. Were defendant to proceed to trial and lose her case, all of her assets would have been lost. In that event, her counsel risked not being paid.

Her attorney was thus forced to choose between two equally unpalatable alternatives. He could advise his client to proceed to a complex and long trial, aware that preparation had been severely hindered by defendant's detention, risking a huge financial loss of his own from representation over many months with no substantial hope for a fee. Or he could advise her to plead guilty and cut his potential losses. This apparent conflict was forced upon defense counsel by government's declared position that it now owned essentially all of defendant's assets through forfeiture.

The court attempted to mitigate the conflict problem by appointing additional counsel, pursuant to the Criminal Justice Act. 18 U.S.C. § 3006A. Appointed counsel is not subject to the same potential conflict since compensation comes from the government, not from the defendant's seized assets.

### C. Sentencing

#### 1. Calculation of offense level

■ The plea agreement submitted by the parties suggested an offense level of 20. This was calculated by using a base level of 8, a one-level enhancement for the type of conviction (18 U.S.C. § 1957), and 14 levels for the amount of funds, minus three levels for acceptance of responsibility.

Probation has suggested that defendant might be subject to a further three-point enhancement for knowingly laundering drug money. If defendant had been shown to have had knowledge that drug funds were laundered, this enhancement would be appropriate. The government has not sought to nor established this fact. The court takes judicial notice from the trial of other cases in this court that forms of money laundering to avoid taxation and national limits on the export of dollars rather than drug trafficking leads to much black marketing of currency in South and Central America.

#### 2. Departure

■ As noted in section III.E.1.a, supra, a court may properly depart where the defendant's livelihood has been destroyed, preventing re-entry into criminal activity. This case meets the requirements of a destruction of livelihood departure established in *Gaind*. The court departs downward two points on this ground.

There are other reasons that this case remains outside of the "heartland" of cases. The first is the length and rigor of pretrial detention. Defendant was subject to a grueling schedule as she attempted to prepare her defense. She traveled to and from the court each day under guard, spending many cold hours in transportation or waiting. Due to the bureaucratic difficulties in arranging this procedure, defendant was forced to continually request basic necessities such as warm clothing and appropriate food. This factor is an independent ground for the two-point departure in this case.

A final concurrent and independent factor taking this case out of the heartland is the repeated denials of bail. These denials prevented defendant from effectively preparing her defense or seeing her child. As a result there was an exceptionally strong danger that the plea was not entered into voluntarily. Coercion through pretrial in-

carceration was present. While the amount of coercion was not sufficient to require rejection of the plea, it is enough to take this case out of the heartland of cases envisioned by the Sentencing Commission. *Koon v. United States*, 518 U.S. 81, 95–96, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

These three factors, the destruction of livelihood, the rigor of pretrial detention and the denial of bail creating unusual difficulties in this case, are independent reasons for departure. Based on these reasons individually and collectively, the court departs downward two levels. This leaves an offense level after departures of 18, which translates to a sentence between 27 and 33 months.

 3. Credit for time served and for good behavior

■ A defendant may properly receive credit against her sentence for time served in pretrial detention. In this case, defendant has already served approximately eighteen months. She should receive credit for good behavior from the time of original incarceration, September 22, 2000. This will reduce her incarcerated time to approximately 23 months.

 4. Supervised Release

■ The defendant has pled guilty to crimes of money laundering in Panama through the use of her jewelry business. The government is understandably concerned that upon release she will resume this activity.

One purpose of supervised release is to discourage future criminal acts by limiting behavior likely to lead to these acts. As part of her supervised release for a period of three years after imprisonment, defendant may not conduct business in Panama, nor may she engage in the jewelry or precious metals business. Defendant will also be subject to the additional standard

terms of supervised release: She is not to engage in criminal activity or drug use, or to own a firearm, and is not to associate with people who engage in criminal activity, drug use, or drug trafficking, or who use firearms.

## V. Conclusion

The defendant is sentenced to 27 months in prison and a fine of $250,000. She should receive credit for time served and for good behavior if appropriate.

Following incarceration, she will serve a term of three years of supervised release. Supervised release may be served abroad. As a special condition of supervised release, she may not conduct business in Panama, nor engage in the jewelry or precious metals businesses anywhere or violate any law of the United States or of the country where she resides. Any illegal entry into the United States will be a violation of the terms of supervised release. Further details are spelled out in the judgment of conviction.

SO ORDERED

### Appendix 1

| Year | Percent of Sentences | | | |
| --- | --- | --- | --- | --- |
| | Within Range | Substantial Assistance | Other Downward | Upward Departure |
| 1989 | 82.0 | 3.5 | 8.7 | 5.8 |
| 1990 | 83.4 | 7.5 | 6.9 | 2.3 |
| 1991 | 80.6 | 11.9 | 5.8 | 1.7 |
| 1992 | 77.4 | 15.1 | 6.0 | 1.5 |
| 1993 | 75.3 | 16.9 | 6.6 | 1.1 |
| 1994 | 71.1 | 19.5 | 7.6 | 1.2 |
| 1995 | 71.0 | 19.7 | 8.4 | 0.9 |
| 1996 | 69.6 | 19.2 | 10.3 | 0.9 |
| 1997 | 67.9 | 19.2 | 12.1 | 0.8 |
| 1998 | 66.3 | 19.3 | 13.6 | 0.8 |

| 1999 | 64.9 | 18.7 | 15.8 | 0.6 |
| 2000 | 64.5 | 17.9 | 17.0 | 0.7 |

Source: United States Sentencing Commission Sourcebook of Statistics, Figure G (percent of Offenses Receiving Each Type of Departure). The 2000 Sourcebook provided 1996 to 2000 statistics; the 1996 Sourcebook provided 1989–96 statistics.

As noted in the 1996 Sourcebook, 1989 and 1990 information is derived from a 25–percent random sample of cases; later years represent all guidelines cases where complete court data was available.1989 information was for the calendar year; subsequent years' statistics are for fiscal year, which results in some overlap for statistics from October to December 1989.

Appendix 2: *Disposition of Federal Criminal Defendants, National*

| Fiscal Year | Total Defendants | Number of Defendants Convicted and Sentenced* | Percent Convicted | Guilty Plea | No Contest Plea** | Combined Guilty and No Contest Pleas | Percent Pleading Guilty or No Contest | Defendants Convicted At Trial | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Convicted by Court | Percent | Convicted by Jury | Percent |
| 1971 | 44,615 | 32,103 | 72% | 27,544 | - | 27,544 | 85.8% | 1,416 | 4.4% | 3,143 | 9.8% |
| 1972 | 49,516 | 37,220 | 75% | 31,714 | - | 31,714 | 85.2% | 1,847 | 5.0% | 3,659 | 9.8% |
| 1973 | 46,724 | 34,983 | 75% | 29,009 | - | 29,009 | 82.9% | 1,873 | 5.4% | 4,101 | 11.7% |
| 1974 | 48,014 | 36,230 | 75% | 30,660 | - | 30,660 | 84.6% | 1,785 | 4.9% | 3,785 | 10.4% |
| 1975 | 49,212 | 37,433 | 76% | 31,816 | - | 31,816 | 85.0% | 1,580 | 4.2% | 4,037 | 10.8% |
| 1976 | 51,612 | 40,112 | 78% | 34,041 | - | 34,041 | 84.9% | 1,587 | 4.0% | 4,484 | 11.2% |
| 1977 | 53,189 | 41,468 | 78% | 35,336 | - | 35,336 | 85.2% | 1,629 | 3.9% | 4,503 | 10.9% |
| 1978 | 45,922 | 36,505 | 79% | 31,112 | - | 31,112 | 85.2% | 1,431 | 3.9% | 3,962 | 10.9% |
| 1979 | 41,175 | 32,913 | 80% | 27,295 | - | 27,295 | 82.9% | 2,006 | 6.1% | 3,612 | 11.0% |
| 1980 | 36,560 | 28,598 | 78% | 23,111 | - | 23,111 | 80.8% | 1,851 | 6.5% | 3,636 | 12.7% |
| 1981 | 38,127 | 29,868 | 78% | 24,322 | - | 24,322 | 81.4% | 1,867 | 6.3% | 3,679 | 12.3% |
| 1982 | 40,466 | 32,252 | 80% | 26,355 | 1,037 | 27,392 | 84.9% | 1,205 | 3.7% | 3,655 | 11.3% |
| 1983 | 43,329 | 35,591 | 82% | 29,814 | 709 | 30,523 | 85.8% | 1,286 | 3.6% | 3,782 | 10.6% |
| 1984 | 44,501 | 36,104 | 81% | 31,060 | 401 | 31,461 | 87.1% | 969 | 2.7% | 3,674 | 10.2% |
| 1985 | 47,360 | 38,530 | 81% | 33,364 | 459 | 33,823 | 87.8% | 994 | 2.6% | 3,713 | 9.6% |
| 1986 | 50,040 | 40,740 | 81% | 34,927 | 521 | 35,448 | 87.0% | 1,139 | 2.8% | 4,153 | 10.2% |
| 1987 | 54,168 | 43,942 | 81% | 37,816 | 624 | 38,440 | 87.5% | 1,371 | 3.1% | 4,131 | 9.4% |
| 1988 | 50,440 | 40,931 | 81% | 34,872 | 616 | 35,488 | 86.7% | 1,252 | 3.1% | 4,191 | 10.2% |
| 1989 | 52,955 | 43,479 | 82% | 36,993 | 718 | 37,711 | 86.7% | 1,128 | 2.6% | 4,640 | 10.7% |
| 1990 | 55,267 | 45,520 | 82% | 39,093 | 597 | 39,690 | 87.2% | 979 | 2.2% | 4,851 | 10.7% |
| 1991 | 57,410 | 47,092 | 82% | 40,918 | 539 | 41,457 | 88.0% | 631 | 1.3% | 5,004 | 10.6% |
| 1992 | 59,644 | 50,260 | 84% | 44,154 | 476 | 44,630 | 88.8% | 578 | 1.2% | 5,052 | 10.1% |
| 1993 | 61,309 | 51,723 | 84% | 46,178 | 360 | 46,538 | 90.0% | 502 | 1.0% | 4,683 | 9.1% |
| 1994 | 59,625 | 49,717 | 83% | 45,044 | 385 | 45,429 | 91.4% | 491 | 1.0% | 3,797 | 7.6% |
| 1995 | 54,980 | 46,773 | 85% | 42,803 | 300 | 43,103 | 92.2% | 467 | 1.0% | 3,203 | 6.8% |
| 1996 | 60,255 | 52,270 | 87% | 47,921 | 275 | 48,196 | 92.2% | 461 | 0.9% | 3,613 | 6.9% |
| 1997 | 63,148 | 55,648 | 88% | 51,647 | 271 | 51,918 | 93.3% | 499 | 0.9% | 3,231 | 5.8% |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1998 | 67,934 | 59,885 | 88% | 55,913 | 343 | 56,256 | 93.9% | 601 | 1.0% | 3,028 | 5.1% |
| 1999 | 73,481 | 64,815 | 88% | 61,239 | 387 | 61,626 | 95.1% | 487 | 0.8% | 2,702 | 4.2% |
| 2000 | 75,071 | 67,036 | 89% | 63,503 | 360 | 63,863 | 95.3% | 632 | 0.9% | 2,541 | 3.8% |
| 2001 | 75,650 | 67,731 | 90% | 64,148 | 254 | 64,402 | 95.1% | 1,035 | 1.5% | 2,294 | 3.4% |

Source: Statistical Table D-4 and Table D-6 (provided by Accounting Office); additional calculations of percentages done by the court.

*June data for years 1971 through 1987.

**Prior to 1982, data for guilty pleas and nolo contendere were combined.

Appendix 3: Disposition of Federal Criminal Defendants, Eastern District of New York

| Fiscal Year | Total Defendants | Number of Defendants Convicted and Sentenced* | Percent Convicted | Guilty Plea | No Contest Plea** | Combined Guilty and No Contest Pleas | Percent Pleading Guilty or No Contest | Defendants Convicted At Trial | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Convicted by Court | Percent | Convicted by Jury | Percent |
| 1971 | 1277 | 948 | 74% | 773 | - | 773 | 81.5% | 28 | 3.0% | 147 | 15.5% |
| 1972 | 1445 | 1146 | 79% | 924 | - | 924 | 80.6% | 26 | 2.3% | 196 | 17.1% |
| 1973 | 1613 | 1141 | 71% | 893 | - | 893 | 78.3% | 33 | 2.9% | 215 | 18.8% |
| 1974 | 1639 | 1203 | 73% | 984 | - | 984 | 81.8% | 47 | 3.9% | 172 | 14.3% |
| 1975 | 1257 | 892 | 71% | 736 | - | 736 | 82.5% | 15 | 1.7% | 141 | 15.8% |
| 1976 | 1235 | 994 | 80% | 822 | - | 822 | 82.7% | 25 | 2.5% | 147 | 14.8% |
| 1977 | 1310 | 1010 | 77% | 827 | - | 827 | 81.9% | 13 | 1.3% | 170 | 16.8% |
| 1978 | 1084 | 933 | 86% | 747 | - | 747 | 80.1% | 16 | 1.7% | 170 | 18.2% |
| 1979 | 1094 | 951 | 87% | 762 | - | 762 | 80.1% | 11 | 1.2% | 178 | 18.7% |
| 1980 | 889 | 747 | 84% | 556 | - | 556 | 74.4% | 19 | 2.5% | 172 | 23.0% |
| 1981 | 1046 | 897 | 86% | 716 | - | 716 | 79.8% | 2 | 0.2% | 179 | 20.0% |
| 1982 | 1078 | 937 | 87% | 740 | 7 | 747 | 79.7% | 8 | 0.9% | 182 | 19.4% |
| 1983 | 894 | 791 | 88% | 633 | 3 | 636 | 80.4% | 12 | 1.5% | 143 | 18.1% |
| 1984 | 853 | 776 | 91% | 650 | 0 | 650 | 83.8% | 6 | 0.8% | 120 | 15.5% |
| 1985 | 849 | 783 | 92% | 647 | 6 | 653 | 83.4% | 25 | 3.2% | 105 | 13.4% |
| 1986 | 1008 | 943 | 94% | 785 | 0 | 785 | 83.2% | 3 | 0.3% | 155 | 16.4% |
| 1987 | 1057 | 1004 | 95% | 812 | 2 | 814 | 81.1% | 5 | 0.5% | 185 | 18.4% |
| 1988 | 1195 | 1106 | 93% | 909 | 1 | 910 | 82.3% | 14 | 1.3% | 182 | 16.5% |
| 1989 | 1218 | 1119 | 92% | 955 | 3 | 958 | 85.6% | 36 | 3.2% | 125 | 11.2% |
| 1990 | 1274 | 1167 | 92% | 1040 | 1 | 1041 | 89.2% | 29 | 2.5% | 97 | 8.3% |
| 1991 | 1275 | 1198 | 94% | 1079 | 2 | 1081 | 90.2% | 8 | 0.7% | 109 | 9.1% |
| 1992 | 1628 | 1564 | 96% | 1417 | 1 | 1418 | 90.7% | 22 | 1.4% | 124 | 7.9% |
| 1993 | 1794 | 1730 | 96% | 1568 | 3 | 1571 | 90.8% | 6 | 0.3% | 153 | 8.8% |
| 1994 | 1671 | 1585 | 95% | 1472 | 2 | 1474 | 93.0% | 6 | 0.4% | 105 | 6.6% |
| 1995 | 1473 | 1384 | 94% | 1307 | 3 | 1310 | 94.7% | 8 | 0.6% | 66 | 4.8% |
| 1996 | 1646 | 1551 | 94% | 1450 | 3 | 1453 | 93.7% | 4 | 0.3% | 94 | 6.1% |
| 1997 | 1697 | 1635 | 96% | 1543 | 6 | 1549 | 94.7% | 4 | 0.2% | 82 | 5.0% |
| 1998 | 1585 | 1530 | 97% | 1463 | 2 | 1465 | 95.8% | 5 | 0.3% | 60 | 3.9% |
| 1999 | 1557 | 1514 | 97% | 1446 | 0 | 1446 | 95.5% | 7 | 0.5% | 61 | 4.0% |

| 2000 | 1668 | 1611 | 97% | 1533 | 1 | 1534 | 95.2% | 0 | 0.0% | 77 | 4.8% |
| 2001 | 1430 | 1385 | 97% | 1336 | 0 | 1336 | 96.5% | 1 | 0.1% | 48 | 3.5% |

Source: Statistical Table D-4 and Table D-6 (provided by Accounting Office); additional calculations of percentages done by the court.

* June data for years 1971 through 1987.

**Prior to 1982, data for guilty pleas and nolo contendere were combined.